**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 95-10593
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CYNTHIA MIZELL, also known as Cynthia L
Walker,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

July 1, 1996

Before KING, DAVIS, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Cynthia Mizell appeals her convictions for conspiracy to commit robbery affecting interstate commerce and robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951. Finding no reversible error, we affirm.

I

Mizell, John Walker, and Kevin Turnage drove to the Armored Transport Company ("ATC") in Fort Worth, Texas, and Walker robbed two armored car guards at gunpoint, stealing more than $400,000. As a result of these events, Turnage pleaded guilty to misprision

of a felony in exchange for his cooperation with the government's prosecution of Mizell.[1] Mizell was charged by indictment with conspiracy to commit robbery affecting interstate commerce and robbery affecting interstate commerce. The government then filed a superseding information, charging Mizell with misprision of a felony, in violation of 18 U.S.C. § 4.

Mizell agreed to waive indictment on the superseding information and pleaded guilty to the misprision of a felony charge in exchange for the government's agreement to dismiss the indictment containing the robbery charges. Pursuant to her guilty plea, Mizell stipulated that she conspired with Walker and others to commit robbery and that she actually participated with Walker and others in committing robbery of the armored car guards. At Mizell's plea agreement hearing, the district court rejected the plea agreement based upon its finding, as required by § 6B1.2(a) of the sentencing guidelines,[2] that the misprision charge did not adequately reflect the seriousness of Mizell's actual offense behavior. Consequently, Mizell withdrew her guilty plea, and both the superseding information and the original indictment were set for trial.

---

[1]     Misprision of a felony occurs when an individual "having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States." 18 U.S.C. § 4.

[2]     Section 6B1.2 of the sentencing guidelines provides, "In the case of a plea agreement that includes the dismissal of any charges . . . the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior." U.S.S.G. § 6B1.2.

Before the trial began, the district court gave Mizell an opportunity to ask that the information charging the misprision offense be dismissed. Mizell rejected this suggestion and stated that she wanted to leave the information pending, so the case would be tried to the jury on both counts of the indictment as well as the lesser count in the information. The jury returned guilty verdicts on the information and on both counts of the indictment.

Mizell appealed her convictions. This Court affirmed Mizell's conviction for misprision, but reversed and remanded her conspiracy and robbery convictions for a new trial. *United States v. Mizell,* No. 93-1512 (5th Cir. Oct. 13, 1994). A second jury convicted Mizell of conspiracy and robbery affecting interstate commerce. Mizell now appeals these convictions, arguing several points of error, each designed to demonstrate that she was denied a fair trial.

II

Mizell argues that the district court violated her Sixth Amendment right to present witnesses on her own behalf by not allowing her to elicit certain testimony from a prosecution witness. The government contends that the district court's actions constituted a proper limitation of Mizell's right to cross-examine the witness.

Kevin Turnage testified at trial as a witness for the prosecution. He testified about his involvement in the robbery, the roles that the other participants played, and his plea agreement with the government. As to Mizell, Turnage testified

that she drove the car to the scene of the robbery, and that she participated in counting the money after the robbery. In contrast, Mizell testified that she did not drive the car to the scene of the robbery, that she had no prior knowledge that a robbery was going to take place when they drove to the ATC, and that she did not help count the money after the robbery. Mizell's attorney, Frank McCown, cross-examined Turnage concerning the events surrounding the robbery, his plea agreement with the government, dishonest statements that he had given the FBI, and his drinking problem and how it affected his memory of the robbery.

McCown then attempted to question Turnage about the FBI approaching him after receiving Mizell's account of the robbery, which contradicted what Turnage had told them earlier. The district court admonished McCown to stay within the scope of direct examination.[3] McCown then informed the district court that "probably everything else" he had to ask Turnage was outside the scope of the direct examination and requested that Turnage be recalled during the defense's case-in-chief. The district court denied the request because Mizell had not listed Turnage on her witness list, as required by the local discovery rules.[4]

At the end of trial, McCown made a proffer of the evidence

---

[3]     Specifically, McCown asked Turnage, "There was a time that the FBI came back to you and told you that Cindy Mizell had now given them a statement and it was different from what you had told them; is that not correct, sir?"

[4]     Local Rule 8.1(b) of the Local Rules for the Northern District of Texas states, "At least 3 days before trial, each counsel shall file and deliver to opposing counsel, the Court, and the court reporter, a list of all exhibits and witnesses, except those offered solely for impeachment." The government had disclosed Turnage as one of its witnesses that it intended to call at trial, but Mizell had not.

that he wanted to establish through additional examination of Turnage. McCown wanted to ask Turnage about inconsistent statements that he had made to the FBI about Mizell's and his own involvement in the robbery and whether implicating Mizell in the robbery was Turnage's only chance for leniency with the government. In addition, McCown wanted to establish that John Walker had made various threats against Turnage and his family in the event that Turnage implicated Walker in the robbery. These threats, Mizell argues, would indicate that Walker was a violent man. Mizell argues further that this testimony would add credence to Mizell's claim that she feared Walker and therefore was afraid to report the robbery after it occurred.[5]

A

McCown told the district court that he did not list Turnage on his witness list because he assumed that he would be able to inquire into the proffered issues on cross-examination. A district

_____

[5] Specifically, McCown wanted to question Turnage about the contradictions in his statements to the FBI. In his second statement to the FBI, Turnage allegedly said that he *believed* that Mizell had driven the car to the robbery, not that he knew she had. Also, in his first statement, Turnage allegedly did not tell the FBI that he asked for $20,000 from the robbery, and he stated that he had not been involved in the robbery. McCown also wanted to question Turnage as to whether he was using drugs during the time of the robbery.

Additionally, McCown wanted to ask Turnage if he told the FBI that he tried to give the money back from the robbery, that Walker got mad and said that he would kill him, and that if he was implicated in the robbery he would hire someone to get even. McCown wanted to ask Turnage if he believed that Walker was a man to be feared and whether Turnage was afraid of him. McCown also wanted to inquire whether Walker had asked Turnage to follow another participant in the robbery, Bill Brown, to find out where he lived, if Turnage had in fact followed Brown and told Walker where Brown lived, and whether Turnage so complied because he was afraid of Walker. Two weeks after the robbery, Walker allegedly threatened to kill Turnage and his family if any of the information concerning the robbery was disclosed, and McCown wanted to ask Turnage if he believed Walker's threats. Finally, McCown wanted to ask Turnage whether it was true that unless he gave some testimony that Mizell was guilty, he would not have any incriminating information to use to plea bargain with the government.

court has broad discretion to reasonably restrict cross-examination; however, this discretion is limited by the Sixth Amendment. *United States v. Cooks,* 52 F.3d 101, 103 (5th Cir. 1995). "Cross-examination to expose a witness'[s] motive for testifying is always relevant as discrediting the witness and affecting the weight of his testimony, and is especially important with respect to witnesses who may have substantial reason to cooperate with the government." *Id.* at 103-04 (citation omitted). This right is particularly important when the witness is critical to the prosecution's case. *Id.* at 104. A "criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986) (citation omitted); *cf. Cooks,* 52 F.3d at 104 ("The constitutional right is not violated, however, if the jury ha[s] sufficient information to appraise the bias and motives of the witness.").

We find that McCown's questions concerning inconsistent statements that Turnage had made to the FBI and Turnage's motive for implicating Mizell were probative of Turnage's credibility and were therefore proper subjects on cross-examination. *See* FED. R. EVID. 611(b) ("Cross-examination should be limited to the subject

matter of the direct examination and matters affecting the credibility of the witness."). Turnage was the prosecution's sole witness as to Mizell's direct involvement in the robbery; none of the other robbery participants testified at Mizell's trial. Therefore, only Turnage could directly contradict Mizell's own testimony that she did not drive the car to the scene of the robbery and that she did not know that a robbery was about to take place when she went in the car with John Walker and Turnage.[6] Certainly, an earlier statement by Turnage to the FBI that he "believed," but did not know, that Mizell drove the car to the ATC would have been probative of his credibility and his ability to remember Mizell's role in the crime. In addition, if implicating Mizell in the robbery was Turnage's only opportunity for leniency, this fact could also affect his credibility. By not allowing Mizell to impeach Turnage's credibility with this evidence, the district court restricted Mizell's cross-examination of Turnage.

However, such restriction does not arise to the level of a Sixth Amendment violation unless such restriction was unreasonable. *Cooks,* 52 F.3d at 103. In order to determine whether a district court's restriction of cross-examination is reasonable, we must assess whether the jury was given adequate information to appraise the bias and motives of the witness. *Id.* The district court allowed McCown to ask several questions concerning Turnage's

_____

[6] Turnage testified at trial that Mizell drove to the ATC without any directions from Walker as to where they were going. This testimony impeached Mizell's claim that she did not have prior knowledge that a robbery was about to take place.

-7-

inconsistent statements to the FBI and his motive to testify against Mizell. On cross-examination, Turnage admitted that in his first statement to the FBI, he lied about Mizell's involvement in the robbery. McCown was also able to ask Turnage whether he had initially told the FBI that he and Walker had discussed committing the robbery several days before they actually did commit the crime. Turnage denied making this statement to the FBI. The statement would have contradicted his testimony at trial that he did not know that they were going to commit a robbery until he was already in the car on the way to the ATC. The prosecution also elicited testimony from Turnage concerning inconsistent statements he had given the FBI. On direct examination, Turnage admitted that when he first spoke with the FBI, he stated that he did not drive the car, contrary to Turnage's testimony at trial that he drove the car away from the robbery. Turnage also admitted that he lied to the FBI when he stated that he tried to return the robbery proceeds that he received.

Concerning his plea bargain, McCown asked Turnage, who was having trouble remembering details from the night of the robbery, whether he had selectively remembered those things about the robbery that were necessary to get him the plea bargain. Turnage responded that he remembered the truth. McCown also asked Turnage whether it was his job as part of fulfilling his contract with the government to implicate Mizell in the robbery. When Turnage responded that his job was simply to be honest and cooperate, McCown pointed out the 5K motion which recommended lenient

treatment for Turnage as a result of his cooperation with Mizell's prosecution.[7]  This motion was also introduced into evidence.

Having exhaustively reviewed the record, we conclude that the jury had adequate information with which to assess Turnage's credibility.  Turnage admitted on direct and cross-examination that he had made inconsistent statements to the FBI concerning his and Mizell's involvement in the robbery.  The jury was also made well aware of the fact that Turnage had a tremendous amount to gain by implicating Mizell in the robbery.  Turnage testified that if he did not cooperate with the government, he potentially faced forty years in prison, as opposed to the three years which he received because of his cooperation.  The excluded impeachment evidence would have merely been cumulative of the impeachment evidence already admitted at trial.  Therefore, we conclude that no constitutional error was committed by the district court's limitation of Mizell's cross-examination of Turnage.  *See United States v. Hamilton,* 48 F.3d 149 (5th Cir. 1995) (holding that, because there was so much additional impeachment evidence admitted in the case, further impeachment of a witness whose credibility was vital to the prosecution's case "could not have affected the trial so as to prejudice [the defendant's] substantial rights").

B

Some of the evidence that McCown wished to elicit from

---

[7]  Section 5K1.1 of the sentencing guidelines provides that the government may make a motion asking the sentencing judge to depart downward from the guidelines when a defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1.

Turnage, was not proper evidence for cross-examination because it was outside the scope of direct examination and was not probative of Turnage's credibility. Mizell argues that the district court's refusal, based on the local discovery rules, to allow her to recall Turnage violated her rights under the Compulsory Clause of the Sixth Amendment.[8]

A defendant's Sixth Amendment right to present witnesses in her own defense "is an essential attribute of the adversary system." *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S. Ct. 646, 652, 98 L. Ed. 2d 798 (1988). However, this right is limited and must be weighed against the countervailing interests in "the integrity of the adversary process, . . . the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 414-15, 108 S. Ct. at 656. The Supreme Court has held that a district court can preclude a defendant from calling a witness as punishment for the defendant's willful violation of a discovery order. *See id.* at 414, 108 S. Ct. at 655 (holding that preclusion of a witness's testimony was appropriate where the defendant's violation of a discovery request was "willful and motivated by a desire to obtain a tactical advantage"). However, the Supreme Court stated that in most cases "alternative sanctions are adequate

---

[8]     The Compulsory Clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. The Supreme Court has held that the right to have witnesses present in the courtroom necessarily also involves the right to have them heard by the trier of fact. *Taylor v. Illinois,* 484 U.S. 400, 409, 108 S. Ct. 646, 653, 98 L. Ed. 2d 798 (1988).

and appropriate." *Id.*

*Taylor* allows a district court to inquire into a party's reasons for failing to comply with a discovery rule, as the district court did in Mizell's case. *Id.* at 415, 108 S. Ct. at 656. McCown stated that he did not list Turnage on his witness list because he believed he could inquire into these subjects on cross-examination. However, McCown stated at oral argument that he was aware of the district court's strict policy of limiting cross-examination to the subject matter of the direct examination and was not surprised by the district court's limits. There is no indication though that Mizell's omission of Turnage's name on her witness list was willful or done out of an attempt to gain an unfair advantage over the prosecution. Indeed, the district court did not find that Mizell willfully violated the discovery rules, nor did it consider whether Mizell's Sixth Amendment right outweighed the efficiency and fairness concerns cited in *Taylor.* Instead, the district court erroneously concluded that preclusion was permissible for any discovery violation. *See Michigan v. Lucas,* 500 U.S. 145, ___, 111 S. Ct. 1743, 1748, 114 L. Ed. 2d 205 (1991) ("We did not hold in *Taylor* that preclusion is permissible every time a discovery rule is violated. Rather, we acknowledged that alternative sanctions would be adequate and appropriate in most cases.") (citation omitted). As a result, Mizell's rights under the Compulsory Clause of the Sixth Amendment were violated by the court's preclusion of Mizell's witness.

However, our inquiry does not end here, for a violation of a

defendant's right to present witnesses on her own behalf does not constitute reversible error if the error was harmless. *United States v. Alexander,* 869 F.2d 808, 812 (5th Cir. 1989), *cert. denied,* 493 U.S. 1069, 110 S. Ct. 1110, 107 L. Ed. 2d 1018 (1990). The precluded testimony concerned certain threats Walker had made to kill Turnage and his family, or to "get even," if Turnage implicated Walker in the robbery. Mizell wanted this evidence to establish Turnage's fear of Walker to add credence to her testimony that she was afraid of Walker.

Mizell's fear of Walker was central to her defense because she contended at trial that she had a "dependent personality disorder" which caused her to play a submissive role in her relationship with Walker and to be overly accommodating to him. According to Mizell, as the relationship progressed, she learned about Walker's violent tendencies and became too afraid to leave him or do anything which would provoke him. This fear, Mizell argued, explained why she went in the car with Walker on the night of the robbery without inquiring as to where they were going and why she did not report the robbery after it occurred. We agree that Turnage's admission that he too feared Walker could have made Mizell's fear of Walker appear more credible to the jury.

However, Mizell presented such a substantial amount of evidence concerning Walker's violent nature, his threats, his large stature, and his proficiency in karate,[9] that any additional

---

[9]     Specifically, Mizell presented evidence which established that Walker was about six feet three inches tall, weighed around two hundred ten pounds, had a very muscular frame, was a black belt in karate, and made his living as a

-12-

testimony from Turnage would have been cumulative. Mizell's stepfather, Frank Johnson, testified about Walker's violent nature and stories Walker had told him about killing and harming people who had crossed him.[10] Johnson stated that he was afraid of Walker, even though he was not a man who is easily intimidated. Mizell also testified that Walker told her the same stories about violent acts he had committed, that Walker kept guns, that he abused her and her son by putting them in painful karate holds, and that she was afraid of him.

Mizell also testified about the threats that Walker had allegedly made to Turnage and Brown.[11] Given the overwhelming amount of evidence that Mizell presented regarding Walker's frightening propensities, and the lack of contradictory evidence on the issue, we conclude that the district court's preclusion of Turnage's testimony was harmless.

### III

Mizell states that the district court erred in denying her pre-trial motion to dismiss the indictment containing the conspiracy and robbery charges on double jeopardy, res judicata, and collateral estoppel grounds. Before Mizell was re-tried on the

---

bouncer in bars and nightclubs.

[10] Johnson testified that Walker told him that he once killed a man who had killed his pregnant wife. Walker also told Johnson that he had once taken a man who was "bothering him" to the woods, tied him to a tree, disrobed him, and then placed a lit highway fuse flare in the man's rectum.

[11] Mizell stated that Walker had gone to Turnage's house, threatened his life, and beat him up. In addition, Mizell testified that Walker stated that he should kill Bill Brown, because Walker suspected he was cooperating with the government. Walker therefore had Turnage follow Brown home from work to find out where he lived.

conspiracy and robbery charges, she moved to dismiss the indictment on the grounds that by convicting her of misprision of a felony, the jury had conclusively determined that someone other than her had committed the crimes of conspiracy and robbery.

Mizell's only argument on this issue is that a defendant can only be convicted of misprision of a felony if the government proves that someone other than the misprision defendant committed the felony.[12]0.     In her reply brief, Mizell argues, for the first time on appeal, that she did not "voluntarily" waive her right against self-incrimination when she insisted on not dismissing the misprision offense at the first trial. While we acknowledge that the district court did not expressly make Mizell aware of the fact that she was waiving her right against self-incrimination by insisting on being tried on the misprision offense, any Fifth Amendment defense that Mizell may have is relevant only to her misprision conviction.  Mizell therefore should have raised this issue when she appealed her misprision conviction, not on her appeal of her conspiracy and robbery convictions. [13] Neither the elements of misprision,[14] nor our opinion in *United States v. Warters,* 885 F.2d 1266, 1275 (5th Cir. 1989), supports Mizell's argument. *Warters* acknowledges that "[m]isprision is normally not committed by one of the perpetrators of the underlying offense." *Id.* However, this observation is not based on any requirement that a person other than the defendant commit the underlying felony.  Rather, the observation stems from the fact that the

---

[12]     In her reply brief, Mizell argues, for the first time on appeal, that she did not "voluntarily" waive her right against self-incrimination when she insisted on not dismissing the misprision offense at the first trial.  Any Fifth Amendment defense that Mizell may have had to her misprision conviction is irrelevant to her conspiracy and robbery convictions.  Mizell therefore should have raised this issue when she appealed her misprision conviction, not on her appeal of her conspiracy and robbery convictions.

[14]     *See supra* note 1 (stating requirements of 18 U.S.C. § 4).

defendant would normally assert her "defense that the failure to make [the felony] known was an exercise of the constitutional right to refrain from self-incrimination." *Id. Warters* acknowledges, however, that it would be possible for a perpetrator of the crime to be convicted for misprision, because a defendant can always waive his Fifth Amendment defense by pleading guilty. *Id.* We conclude, therefore, that the district court did not err in denying Mizell's motion to dismiss the indictment.

IV

Mizell argues that the district judge interfered in her trial to such a degree that became an advocate for the prosecution. In other words, Mizell contends that the district judge's actions created the appearance that he was partial to the government's position, thus violating her due process right to a fair trial. "A federal district judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel." *United States v. Wallace,* 32 F.3d 921, 928 (5th Cir. 1994). A judge's behavior may rise to the level of a constitutional violation, however, if "the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *United States v. Bermea,* 30 F.3d 1539, 1569 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1825, 131 L. Ed. 2d 746 (1995). The judge's actions must be both "quantitatively and qualitatively substantial to meet this test." *Id.*

A

The district judge actively managed Mizell's trial, constantly interrupting both the prosecutors and the defense attorneys to remind them not to repeat questions they had already asked and to stay within the scope of the subject matter developed on direct examination when they were cross-examining a witness. The district judge also strongly admonished the defense attorneys several times; however, in most instances, the admonishments were given outside the hearing of the jury. Having carefully reviewed the record, we conclude that the district

-15-

judge's actions in Mizell's case were within his broad discretion to manage the pace and objectivity of the trial. Additionally, we note that any confusion that the district judge may have created concerning his role in the proceedings was ameliorated by the jury instruction that clarified the judge's role in the trial.[15] *See id.* at 1571-72 (stating that the Fifth Circuit has held that a curative jury instruction, like the one given in this case, "can operate against a finding of constitutional error").

B

Mizell contends that the district judge's interrogation of her expert witness, Dr. Schmitt, amounted to a comment on the weight of Schmitt's testimony and therefore violated her due process rights. As we have already noted, "[a] federal district court can interrogate witnesses, whether called by itself or by a party." FED. R. EVID. 614(b). Because Mizell failed to object to the district court's interrogation of Schmitt either at the time of interrogation or at the next available opportunity, we review the district court's action for plain error. *See* FED. R. EVID. 614(c) (objections to the court's interrogation of witnesses "may be made at the time or at the next available opportunity when the jury is not present"); *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied,* ___ U.S. ___, 115 S. Ct. 1266, 131 L. Ed. 2d 145 (1995). "Plain error occurs when the error is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings and would result in manifest injustice." *United States v. Puig-Infante,* 19 F.3d 929, 950 (5th Cir.), *cert. denied,* ___ U.S. ___, 115 S. Ct. 180, 130 L. Ed. 2d 115 (1994).

To support her theory that she was present at the robbery but did not

---

[15] The district judge admonished the jury:

> do not assume from anything I may have said or done during the trial, including any questions I may have asked, that I have any opinion concerning any of the issues in the case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

In addition the judge instructed the jury that they were the "sole judges of the credibility or 'believability' of each witness and the weight to be given the witness' testimony."

"participate" in it, Mizell offered the testimony of psychologist Dr. Schmitt. Schmitt testified that Mizell suffered from a "dependent personality disorder" and an "accommodation syndrome," which explained why Mizell would accompany John Walker, without question, to the robbery, and why she would continue to live with him afterwards.

Mizell's claim is based on the following exchanges that occurred at trial. In response to Schmitt's testimony concerning "John Walker's style," the district judge elicited testimony from Schmitt indicating that Schmitt had never met Walker; he was only testifying from what Mizell had told him.[16] Later, in an effort to speed up the prosecution's cross-examination of Schmitt, the district judge stated, "I think he's told us that all he knows about this case is what she's told him and what he heard sitting out there in the audience a few minutes ago." Mizell also complains of the district judge's questions to Schmitt in response to which Schmitt admitted that a person with a personality disorder can do things and have relationships that are not caused by the disorder.[17] Finally,

---

[16]    The following exchange took place:

SCHMITT:    John Walker's style was to tell violent stories. His style was to carry his guns with him, even in the living room, even while watching TV. To pull it out. To play with it. To fiddle with it. And then if somebody knocked on the door, to stick it under the cushion. The point being that she knew that, "Now, here's a man who not only likes his guns, but a man with [sic] tells violent stories." But playing with the gun reinforced, I would say, her fear of him and her belief that he would hurt her.

COURT:    Let me clarify something. Do you know Mr. Walker?

SCHMITT:    No.

COURT:    You have never talked to him?

SCHMITT:    No, sir.

COURT:    This is all based on something Ms. Mizell told you?

SCHMITT:    It's based on examples of his behavior that she told me about.

[17]    On cross-examination of Schmitt, the following exchange took place:

PROSECUTOR: Are you also able to determine if a person who suffers from personality disorder voluntarily buys land or a house, for instance, or if they're doing that only because they're feeling an obligation to do so?

the district judge asked Schmitt about his practice in forensic psychology. Schmitt informed the court that forensic psychology refers to testifying for lawyers and working with people in legal situations. In response to a question from the district judge, Schmitt testified that one-third of his income is derived from doing legal work.

We conclude that the district judge's interrogation of Schmitt did not amount to plain error. The district judge's questions were aimed at eliciting clarifying testimony, and any effect on Mizell's case was insignificant. Moreover, any error was again corrected by the court's instructions to the jury.

VI

Finally, Mizell argues that the district judge erred in refusing to recuse himself from her retrial, pursuant to 28 U.S.C. § 455.[18] Even if the discretionary rules regarding recusal did not mandate that the district judge recuse himself, Mizell urges us to create a mandatory recusal rule in cases where

SCHMITT:     With the detailed knowledge of that situation, I would know.

COURT:       Let me get some clarification on something.

PROSECUTOR: Yes, Your Honor.

COURT:       Help me understand this:  If a person has a personality disorder--

SCHMITT:     Yes, sir.

COURT:       --do they do anything that's not caused by that disorder?

SCHMITT:     Yes, sir.

COURT:       In other words, they can do things that are not caused by the disorder?

SCHMITT:     Certainly.  Yes, sir.

COURT:       Or that's not caused by the relationship that exists because of the disorder?

SCHMITT:     They can, yes sir.

COURT:       Go ahead.

[18]    Prior to her retrial, Mizell filed a motion to transfer the case to another court, because, according to Mizell, the court had already determined issues relating to her guilt both at her plea agreement hearing and when sentencing her for the misprision charge.

-18-

the district judge has made determinations in earlier proceedings concerning the ultimate issues of the case.

Mizell asserts as grounds for recusal events that occurred before and after her first trial for misprision, conspiracy to commit robbery, and robbery. First, prior to Mizell's first trial, the district judge rejected Mizell's plea agreement that provided for dismissal of the indictment charging her with conspiracy and robbery. The district judge refused to accept the plea agreement because he could not find that the misprision offense, to which Mizell wished to plead guilty, would adequately reflect the gravity of her actual offense behavior, as required by U.S.S.G. § 6B1.2(a)[19] and FED. R. CRIM. P. 11(e).[20]

---

[19] The district judge stated the following at Mizell's plea agreement hearing:

COURT:     So what it finally boils down to is whether the dismissal of Counts 1 and 2 in a conviction and sentencing on the information, if those things satisfy the requirements of Section 6B1.2 . . . .
Under the plea she's made the statutory maximum is 3 years. The guideline is 37 months, which, as a practical matter, makes the guideline 36 months because of the statutory maximum.
If she were to be convicted of the offenses charged in the indictment, . . . the imprisonment range would have been 78 to 97 months.
Well, the potential would be almost three times the range that exists under the misprision charge.
And, frankly, I would have to think some more if it made the difference on how the potential on a gun count would factor into this, and perhaps even the money laundering or structuring.
But, without getting to those, I don't think I can make the determinations that are required to be made by 6B1.2(a) as to this plea agreement.

The prosecutor then explained that the plea agreement was made partly because of Mizell's cooperation with the government, and partly because of what the prosecutor "considered to be a key piece of evidence against Mizell's actual involvement with the robbery had been retracted by Mr. Turnage." In compliance with U.S.S.G. § 6B1.2(a), which requires that the court state its reasons for rejecting a plea agreement in the record, the district court detailed the facts indicating Mizell's involvement in the crimes which had been introduced at the plea agreement hearing and stated that he believed the government could get the case to the jury on the conspiracy and robbery charges. As a result, the district court concluded that it could not make the required finding under § 6B1.2(a) to accept the plea agreement.

[20] FED. R. CRIM. P. 11(e) details the plea agreement procedure. Rule 11(e)(2) provides, "If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court . . . . If the agreement [calls for the dismissal of charges], the court may accept or reject the agreement . . . ."

-19-

Further, at sentencing following Mizell's first trial, the district judge accepted the recommendation of the Presentence Report and increased Mizell's sentence for obstruction of justice because he found that Mizell lied when she testified that she had not driven the car to the robbery scene.[21] These two instances demonstrate, according to Mizell, that the district judge had formulated an opinion as to the strength of the prosecution's case and her guilt which prevented him from being impartial.

Section 455(a) provides that any judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(b)(1) provides that the judge "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." We review a district judge's decision not to recuse himself for abuse of discretion. *Matter of Hipp, Inc.,* 5 F.3d 109, 116 (5th Cir. 1993).

In *Liteky v. United States,* 510 U.S. 540, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994), the Supreme Court addressed the circumstances which could necessitate the recusal of a judge for "impartiality," pursuant to § 455(a), or for "bias or prejudice," pursuant to § 455(b)(1). The specific issue before the *Liteky* Court was whether the "extrajudicial source" doctrine applied to § 455(a).[22] The Court held that the extrajudicial nature of a judge's opinion is a factor to consider in analyzing whether recusal is necessary; however, it is not determinative. *Id.* at ___, 114 S. Ct. at 1156. The "extrajudicial source" doctrine, the court explained, was merely one application of the pejorativeness requirement of the terms "impartiality," and "bias or prejudice" as they are used in §§ 455(a) and

---

[21] Section 3C1.1 of the sentencing guidelines provides, "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Committing perjury is one of the ways that a defendant can obtain a two-level upward adjustment under § 3C1.1. U.S.S.G. § 3C1.1, comment. (n.3(b)).

[22] The "extrajudicial source" doctrine, which the *Liteky* Court termed as a factor rather than a doctrine, provides that "matters arising out of the course of judicial proceedings are not a proper basis for recusal." *Liteky,* 510 U.S. at ___, ___, 114 S. Ct. at 1157, 1151.

-20-

455(b)(1). *Id.* at ___, ___, 114 S. Ct. at 1155, 1156. This pejorativeness requirement mandates that a judge be recused under § 455(b)(1) when his "judicial predispositions go beyond what is normal and acceptable," *id.* at ___, 114 S. Ct. at 1155,[23] and under § 455(a) when his predisposition is "wrongful or inappropriate." *Id.* at ___, 114 S. Ct. at 1156.[24]

In explaining acceptable predispositions that a judge might possess, the Court noted that "judicial rulings alone almost never constitute valid basis for a bias or partiality motion." *Id.* at ___, 114 S. Ct. at 1157. The Court continued, "In and of themselves (i.e., apart from surrounding comments or accompanying opinion), [the rulings] cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved." *Id.* These opinions, which are "formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgement impossible." *Id.* Opinions that a judge forms based on information that he acquires in earlier proceedings are also "not subject to

___

[23]    The Court provided an example of the pejorative connotation of these words:

> Not *all* unfavorable disposition towards an individual (or his case) is properly described by [the] terms [bias or prejudice]. One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate,* either because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote guilty regardless of the facts).

*Id.* at ___, 114 S. Ct. at 1155.

[24]    To explain the type of partiality which requires recusal, the Court stated, "A prospective juror in an insurance-claim case may be stricken as partial if he always votes for insurance companies; but not if he always votes for the party whom the terms of the contract support." *Id.* at ___, 114 S. Ct. at 1156.

-21-

deprecatory characterizations as 'bias' or 'prejudice,'" for "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Id.* at ___, 114 S. Ct. at 1155.

In *Liteky*, the defendants had moved to disqualify the trial judge from their criminal trial, pursuant to § 455(a), based on his behavior at an earlier trial of one of the defendants.[25] *Id.* at ___, 114 S. Ct. at 1151. After explaining the role that the "extrajudicial source" should play in recusal jurisprudence, the Supreme Court affirmed the lower courts' denials of the disqualification motion. *Id.* at ___, 114 S. Ct. at 1158. The Court concluded that the judge's actions of which the petitioners complained consisted of "judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses." *Id.* Moreover, "All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deepseated and unequivocal antagonism that would render fair judgment impossible." *Id.*

Following *Liteky*, we conclude that the district judge did not abuse his discretion in denying Mizell's motion to transfer the case. The grounds for recusal that Mizell asserts consist of judicial rulings which the district judge was *required* to make. *See* U.S.S.G. § 3C1.1; *United States v. Crowell,* 60 F.3d 199, 204 (5th Cir. 1995) (stating that the district court has a duty to take an

---

[25]    The defendants in *Liteky* claimed that recusal was necessary because of the judge's following acts at the earlier trial of one of the defendants:

> stating that at the outset of the trial that its purpose was to try a criminal case and not to provide a political forum; observing after [the defendant's] opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing [the defendant] that closing argument was not a "political forum"; and giving [the defendant] what the defendants considered to be an excessive sentence.

*Id.* at ___, 114 S. Ct. at 1151.

active role in evaluating a plea agreement once it has been disclosed to the court).  We hold that to the extent that the district judge formed any opinion about Mizell's case based on his findings made pursuant to U.S.S.G. §§ 3C1.1, 6B1.2(a), and FED. R. CRIM. P. 11(e), it was a proper and appropriate opinion acquired in the course of judicial proceedings, in reliance on information learned during the proceedings.  *See Crowell,* 60 F.3d at 204 (stating that the court's "evaluation [of a plea agreement] may include a consideration of the punishment allowable under the agreement, as compared to the punishment appropriate for the defendant's conduct as a whole").  Moreover, the district judge's rulings did not display such deepseated animosity towards Mizell, so as to render his fair judgment impossible upon her retrial.  For these reasons, we also decline Mizell's invitation to establish a mandatory rule of disqualification when a judge has made findings of the kind attacked in this case.  We feel the current rules for discretionary recusal provide adequate security for a defendant's right to an impartial judge.

## VII

For the foregoing reasons, we AFFIRM Mizell's conviction.