REVISED - December 12, 2000

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 98-30693

ROBERT WILKERSON,

Petitioner-Appellant,

versus

BURL CAIN, Warden, Louisiana State Penitentiary,

Respondent-Appellee.

Appeal from the United States District Court
for the Middle District of Louisiana

December 6, 2000

Before POLITZ, EMILIO M. GARZA, and DENNIS, Circuit Judges.

POLITZ, Circuit Judge:

Robert Wilkerson appeals the denial of his second habeas corpus petition brought under 28 U.S.C. § 2254. For the reasons assigned, we vacate the decision of the district court and remand for further proceedings consistent herewith.

## BACKGROUND

In 1973, while an inmate at Louisiana State Penitentiary at Angola, Wilkerson and fellow inmate Grady Brewer were convicted of the second-degree murder of inmate August Kelly, who was stabbed to death in a prison fight. On appeal, the Louisiana Supreme Court vacated Wilkerson's conviction, holding that the trial court abused its discretion in requiring Wilkerson to appear before the jury handcuffed, shackled, and with his mouth taped.[1] On retrial, Wilkerson was convicted and received a sentence of life imprisonment.

The state's only evidence that Wilkerson committed the crime was the eyewitness testimony of inmate William Riley who testified at both trials that he was standing within four to five feet of the altercation and witnessed Wilkerson stab Kelly. There was no physical evidence linking Wilkerson to the murder. Although eight knives were seized from prisoners, the knife used to inflict the fatal wounds was never discovered. No fingerprints were found; no blood samples were taken. Wilkerson's conviction was affirmed on direct appeal.[2]

After exhausting his state remedies, Wilkerson filed a federal habeas petition

---

[1]**State v. Brewer,** 301 So.2d 630 (La. 1974). These restraints were imposed due to an unseemly outburst by Brewer.

[2]**State v. Wilkerson,** 326 So.2d 353 (La. 1976).

2

under 28 U.S.C. § 2254 asserting that: (1) women were excluded from the grand jury venire in violation of the Constitution; (2) an individual member of the grand jury should have been excluded on the grounds of improper domicile; (3) he was denied an adequate opportunity to cross-examine Riley; (4) he was wrongly handcuffed and shackled at his second trial; and (5) counsel was ineffective for failing to reargue a previously denied motion to quash the indictment based on the exclusion of women from the grand jury venire, failing to move to quash the indictment based on the allegedly unqualified grand juror, and failing to object when he was handcuffed and shackled at the second trial.[3] Bound by precedent, the panel granted habeas relief on the grand jury composition claim, but requested the court to reconsider the issue en banc. Wilkerson's other constitutional challenges were rejected as without merit.[4] On rehearing, the en banc court reversed the panel's decision based on **Daniel v. Louisiana,**[5] which held that **Taylor v. Louisiana**[6] did not apply retroactively to convictions obtained by juries empaneled prior to **Taylor's** effective date. Thus, **Taylor's** holding, that

---

[3]**Wilkerson v. Whitley,** 16 F.3d 64 (5th Cir. 1994).

[4]**Id.** at 66-68.

[5]420 U.S. 31 (1975).

[6]419 U.S. 522 (1975).

3

Louisiana's constitutional provision allowing women to be exempt from petit jury service violated the Constitution, did not affect the validity of Wilkerson's conviction. The en banc court reinstated the panel's opinion in all other respects, and the Supreme Court denied certiorari.[7]

In August 1995, Wilkerson filed the instant habeas petition in the district court in which he raised three issues that were rejected in his prior § 2254 petition: grand jury composition; shackling; and limitation on cross-examination. Wilkerson also raised a new ineffective assistance of counsel claim, alleging that counsel was ineffective for failing to call John Baugh as a defense witness at the second trial. Baugh was one of the prison guards working on the tier the morning of the murder and had released the inmates from their cells to the showers. He testified at the first trial for the prosecution. This ineffective assistance claim was not raised in any prior habeas petition, although Wilkerson concedes knowledge of the facts relative to the claim were known to him when those petitions were filed.

The petition was referred to a magistrate judge who recommended that the writ be denied. Adopting the responsive report and recommendation, the district court rejected all of Wilkerson's constitutional claims and denied him a Certificate

---

[7]**Wilkerson v. Whitley,** 28 F.3d 498 (5th Cir. 1994) (en banc), *cert. denied,* 513 U.S. 1085, *and reh'g denied,* 513 U.S. 1199 (1995).

4

of Probable Cause. On appeal to this Court, Wilkerson's request for a CPC initially was denied. That order, however, was vacated and a CPC subsequently was granted.

**ANALYSIS**

Ordinarily, under Rule 9(b) of the rules governing federal habeas corpus petitions, a federal court will not entertain a successive or otherwise abusive petition.[8] An exception exists if a petitioner can prove that he is "actually innocent" of the crime of conviction.[9] That is, if a petitioner can establish, through new evidence not previously available, that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence,"[10] a

---

[8]Rule 9(b) provides:
> A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

28 U.S.C. foll. § 2254.

Wilkerson's petition is both successive and abusive. As noted, his first three constitutional challenges were reviewed and rejected on the merits by this court and the fourth claim could have been raised in his prior petitions. *See* **Kuhlmann v. Wilson,** 477 U.S. 436, 444 n.6 (1986) (acknowledging the distinction between the two terms).

[9]**Schlup v. Delo,** 513 U.S. 298 (1995).

[10]**Id.** at 327.

federal court may consider otherwise barred constitutional claims in order to avoid a "fundamental miscarriage of justice."[11] Reconsideration of constitutional challenges rejected on the merits by a previous federal court is reserved for only exceptional cases because, as noted in **Schlup,** a substantial showing of actual innocence is extremely rare.[12] To justify granting the writ a habeas petitioner must also show that an independent constitutional violation occurred at the trial that probably resulted in his conviction.[13] Wilkerson's new evidence consists of the following. On June 16, 1988, William Riley executed an affidavit in which he recanted his testimony and stated that he did not witness the killing but, rather, merely related to prison officials what another inmate had told him. Similarly, inmate Charles Lawrence, who testified at the first trial but not the second, executed two affidavits in which he recanted his testimony. In the first, dated April 19, 1988, Lawrence avers that his testimony "should not have been considered credible" because he was coerced into testifying on behalf of the state. He stated that prison officials threatened to indict him for Kelly's murder and would revoke his pending release date if he did not testify. In his affidavit dated July 27, 1995,

---

[11]**Id.** at 321.

[12]**Id.** at 321-22.

[13]**Id.** at 327; **Murray v. Carrier,** 477 U.S. 478, 496 (1986).

6

Lawrence repeated the statements from his first affidavit and added that he knew Wilkerson had no part in the killing because he was standing next to Wilkerson when the offense was committed. In 1997 Grady Brewer, Wilkerson's codefendant, executed an affidavit admitting sole responsibility for Kelly's death. At the second trial Brewer testified that he stabbed Kelly in the chest and back, but he did not say that Wilkerson was not involved.

In reviewing the instant petition the district court did not conduct an evidentiary hearing to determine the reliability of these affidavits. Like the magistrate judge, the court assumed that Wilkerson had met the requisite showing of actual innocence and it then considered his four allegations of constitutional error. Each was rejected. Accordingly, for present purposes, we now assume the validity of these affidavits and address each of Wilkerson's claims. Because this habeas petition was filed in 1995, prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, we apply the law as it existed prior to the AEDPA's effective date.[14] We review the district court's conclusions of law *de novo,* and will uphold its findings of fact unless they are clearly erroneous.[15] A

---

[14]**Lindh v. Murphy,** 521 U.S. 320 (1997); **Gochicoa v. Johnson,** 118 F.3d 440 (5th Cir. 1997).

[15]**Fairman v. Anderson,** 188 F.3d 635 (5th Cir. 1999).

state court's determination of a factual issue is presumed to be correct and will be upheld unless, among other things, it is not fairly supported by the record as a whole.[16]

Wilkerson contends that the trial court violated his rights under the Confrontation Clause by unduly restricting defense counsel's cross-examination of Riley, the purported eyewitness to the crime. More specifically, defense counsel was not permitted to question Riley about letters he had written to prison administrators prior to Wilkerson's first trial concerning a transfer request and his decision to testify for the state.[17] The trial court limited the scope of counsel's questioning to whether Riley had received anything of value in exchange for his testimony.

Whether the trial court violated Wilkerson's rights under the sixth and fourteenth amendments is a mixed question of law and fact that we review *de novo*.[18] Habeas relief may be granted based on the state court's erroneous evidentiary ruling only if that ruling violated Wilkerson's constitutional rights or

---

[16]28 U.S.C. § 2254(d); **Sumner v. Mata,** 455 U.S. 591 (1982).

[17]Riley testified that he was transferred in either September or October of 1973, after Wilkerson's first trial. Riley also stated, outside the presence of the jury, that he was transferred in July 1973, before the first trial.

[18]**Gochicoa,** 118 F.3d at 445.

8

rendered his trial fundamentally unfair.[19] "Cross-examination is the principal means by which the believability of a witness and the truth of this testimony are tested."[20] Although the scope of cross-examination is within the discretion of the trial court and, as such, it may impose reasonable limits on defense counsel's inquiry, "that discretionary authority comes about only after sufficient cross examination has been granted to satisfy the Sixth Amendment."[21]

The trial court held that the letters and circumstances surrounding Riley's transfer had no bearing on his credibility as a witness. We disagree. It is axiomatic that defense counsel should be permitted to expose to the jury facts relative to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding.[22] Such information is "always relevant as discrediting the witness and affecting the weight of his testimony."[23] In the instant case, it is undisputed that in the subject letters Riley

---

[19]**Johnson v. Puckett,** 176 F.3d 809 (5th Cir. 1999).

[20]**Davis v. Alaska,** 415 U.S. 308, 316 (1974).

[21]**United States v. Landerman,** 109 F.3d 1053, 1061 (5th Cir. 1997) (citing **United States v. Restivo,** 8 F.3d 274 (5th Cir. 1993)).

[22]**Delaware v. Van Arsdall,** 475 U.S. 673 (1986); **Davis,** 415 U.S. at 316-17.

[23]**Landerman,** 109 F.3d at 1062 (quoting **Davis,** 415 U.S. at 316).

9

requested a transfer, one which he ultimately received. That transfer may not have been part of a "deal" with the state but, as we have stated previously, "[w]hat tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists."[24] Further, the imperative of protecting a defendant's right to effective cross-examination is even more critical where, as here, the witness is crucial to the prosecution's case.[25]

Although the defense was able to challenge Riley's credibility in general,[26] we are not persuaded that Wilkerson was afforded an adequate opportunity to cross-examine him on the issue of his credibility tightly focused on his veracity in the instant trial.[27] While defense counsel was allowed to inquire whether Riley

---

[24]**United States v. Hall,** 653 F.2d 1002, 1008 (5th Cir. 1981) (quoting **United States v. Onori,** 535 F.2d 938, 945 (5th Cir. 1976)).

[25]**United States v. Mizell,** 88 F.3d 288 (5th Cir. 1996); **United States v. Cooks,** 52 F.3d 101 (5th Cir. 1995).

[26]Defense counsel was able to establish that Riley was dishonorably discharged from the Marines and, through defense witnesses, that he had a reputation at the penitentiary for being untruthful. In addition, the jury obviously was aware that Riley was an inmate at Angola, and he admitted that he was serving time for armed robbery.

[27]**Davis,** 415 U.S. at 316 ("A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.").

actually received anything in exchange for his testimony, "counsel was unable to make a record from which to argue why [Riley] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."[28] Even more critical, because of the limited extent of cross-examination permitted, the jury may well have inferred that defense counsel merely was "engaged in a speculative and baseless line of attack" on Riley's credibility.[29]

The state insists that inquiry into the letters and subsequent transfer would have unduly prejudiced the defense because the jury would have learned that Wilkerson previously was convicted of Kelly's murder, and could have inferred that Riley was seeking a transfer to get away from Wilkerson. We reject this contention for two reasons. First, the jury already was aware that Wilkerson had gone to trial for Kelly's murder and that the verdict had been reversed on appeal. During voir dire, when questioned about whether he had heard anything about the case, one potential juror responded that he understood that the case had been to the state Court of Appeal and had been referred back for retrial. This statement was made in open court in the presence of the other potential and empaneled jurors. Second, on cross-examination Riley admitted that in October 1973, around the time

---

[28]**Davis,** 415 U.S. at 318.

[29]**Id.**

of Wilkerson's first trial, he told his family that he feared for his life because one of the prison guards told another inmate to "get him." Thus, the jury could have inferred that Riley was afraid, not of Wilkerson, but of this other inmate and prison guard. Regardless, it was within the exclusive province of the jury to make this determination.[30] Clearly, the jury was denied information essential to its assessment of Riley's believability and, in turn, of the strength of the state's case against the defendant. We must conclude that the trial court deprived Wilkerson of his sixth amendment right to confront fully the witnesses against him.

Having reached this conclusion, we must determine whether the error was harmless. Resolution of this inquiry turns on whether the constitutional violation "had substantial and injurious effect or influence in determining the jury's verdict."[31] Under this standard, a petitioner may obtain habeas relief only if there

---

[30]Riley's admission that he feared he would be killed by someone on the tier, other than Wilkerson, when coupled with the numerous letters he wrote to prison administration requesting a transfer, is even stronger evidence that inquiry into these matters should have been permitted. Indeed, Riley had "considerable incentive... to 'slant, unconsciously or otherwise, his testimony in favor of or against a party.'" **United States v. Cooks,** 52 F.3d at 104 (quoting **United States v. Abel,** 469 U.S. 45, 52 (1984)).

[31]**Brecht v. Abrahamson**, 507 U.S. 619, 637 (1993) (holding that harmless error standard announced in **Kotteakos v. United States**, 328 U.S. 750 (1946), applied to habeas review of constitutional claims). See also **California v. Roy**, 519 U.S. 2 (1996), and **O'Neal v. McAninch**, 513 U.S. 432 (1995).

12

is "more than a mere reasonable possibility that [the error] contributed to the verdict."[32]  As emphasized above, the prosecution's case hinged on Riley's supposed eyewitness account of Kelly's murder.  There was <u>no</u> other evidence, physical or otherwise, that connected Wilkerson to the crime.  Had the jury believed that Riley was testifying to curry favor with the state, or that he expected some real or perceived benefit in return, the state's case would have been seriously undermined.  Accordingly, it is apparent that there is more than a reasonable possibility that the verdict may have been different had defense counsel been permitted to inquire fully into these matters.  We therefore must conclude that this constitutional error, in this setting, would warrant the grant of habeas relief.[33]

Wilkerson next contends that he was denied a fair trial because the indicting grand jury systematically excluded women, and because he and the defense witnesses were forced to appear before the jury handcuffed and shackled.  Wilkerson is not entitled to habeas relief on these issues for the reasons as set forth in this court's prior opinions.[34]

Finally, Wilkerson complains that defense counsel was ineffective for failing

---

[32]**Woods v. Johnson**, 75 F.3d 1017, 1026 (5th Cir. 1996) (emphasis omitted).

[33]**Schlup,** 513 U.S. at 327.

[34]**Wilkerson v. Whitley,** 28 F.3d. 498 (en banc); 16 F.3d 64 (5th Cir. 1994).

to call prison guard Baugh as a defense witness in the second trial.[35] Wilkerson contends that if Baugh had testified substantially as he did in the first trial, the defense would have shown that: (1) Baugh could not identify Wilkerson as having been involved in the murder; (2) Riley had a motive to testify for the prosecution because he was the only inmate on the tier who was not charged with Kelly's murder; and (3) Baugh's account of the events and, specifically, of Wilkerson's and Brewer's behavior, was inconsistent with Riley's testimony.

To prevail on an ineffective assistance of counsel claim, the defendant must prove that counsel's performance was both deficient and that the deficiencies were so prejudicial that, but for the errors, there is a reasonable probability that the result would have been different.[36] Counsel is entitled to a presumption that his performance was adequate and "complaints of uncalled witnesses are not favored,

---

[35]As stated earlier, Wilkerson did not raise this claim of ineffective assistance in any of his previous state or federal petitions, although he certainly could have. The magistrate and district court concluded, however, that Wilkerson had exhausted his state remedies with respect to this claim because it was merely a variation on the previous ineffective assistance claims that had been raised and rejected. Regardless, even if Wilkerson has failed to exhaust his state remedies, because exhaustion is not jurisdictional, under pre-AEDPA law we retain the discretion to reach the merits of the petition "to avoid unnecessary delay in granting relief that is plainly warranted." **Granberry v. Greer,** 481 U.S. 129, 135 (1987); **Graham v. Johnson,** 94 F.3d 958 (5th Cir. 1996).

[36]**Strickland v. Washington,** 466 U.S. 668 (1984).

because the presentation of testimonial evidence is a matter of trial strategy."[37]

At Wilkerson's first trial, Baugh testified that he released eleven inmates from their cells to go to the showers, including Kelly, Wilkerson, Brewer, and Riley. The inmates congregated at the back of the tier for a meeting and Baugh overheard inmate Abraham Thompson arguing with Wilkerson. He also heard Wilkerson tell Thompson that he "didn't know anything about it" and that Thompson should ask Kelly. Thompson then started talking to Kelly. A few minutes later, Baugh noticed that Brewer was acting "like he wanted to fight with somebody," but then he "quitened [sic] down." A fight began shortly thereafter. There was a "big crowd... in the corner" and it looked like three to five unidentified inmates were fighting. The inmates initially ignored Baugh's instructions to stop fighting, but they eventually returned to their cells, leaving Kelly dying on the floor. When asked about the whereabouts of Riley and Lawrence, Baugh replied that all of the inmates were at the end of the tier where the fight occurred. He also testified that he did not see anyone using a weapon. Our review of the record persuades that defense counsel was not ineffective for failing to call Baugh as a defense witness in the second trial.

---

[37]**United States v. Cockrell,** 720 F.2d 1423, 1427 (5th Cir. 1983) (internal quotations and citations omitted).

15

For these reasons, we VACATE the decision of the district court and REMAND for further proceedings consistent herewith including, but not necessarily limited to, a determination of the reliability of certain affidavits that heretofore has been assumed.

EMILIO M. GARZA, Circuit Judge, specially concurring:

A Louisiana jury found Robert Wilkerson guilty of murdering fellow inmate August Kelly during a prison melee in 1973. The prosecution's key witness, inmate William Riley, testified that he saw Wilkerson stab Kelly, but he has since altered his testimony. I agree with the majority that we cannot hear Wilkerson's abusive and repetitive federal habeas corpus petition until an evidentiary hearing has shown him "actually innocent." I, however, do not join the majority's Sixth Amendment analysis because I believe it is premature.

The majority correctly notes that Wilkerson must show that he is, more likely than not, "actually innocent" to be able to present his third habeas petition. *See Schlup v. Delo*, 513 U.S. 298 (1995). The claim of actual innocence does not itself provide a basis for relief. It merely serves as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 *(citing Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The district court must hold an evidentiary hearing to assess the newly introduced affidavits because there are reasons to doubt their reliability. First, as a general matter, an affidavit, which is usually prepared by an attorney, states only what an affiant will purportedly testify about. It cannot replace a live hearing where a court can judge an affiant's reliability. As *Schlup* warned, "new statements

-17-

may, of course, be unreliable." *Id.* at 331. Second, Riley submitted his affidavit fifteen years after the murder had occurred. Courts treat last-minute affidavits with "a degree of skepticism" because "[i]t seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him." *Herrera*, 506 U.S. at 423. Third, we should question Riley's credibility, given that he now admits to perjuring himself at trial. "[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts." *United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985). Thus, by holding an evidentiary hearing into "actual innocence," we ensure that Wilkerson does not receive a free pass through the *Schlup v. Delo* "gateway."

While I agree with the majority on the importance of an evidentiary hearing, I do not join its Sixth Amendment analysis. If the district court finds that Wilkerson has failed to meet the "actually innocent" standard, then it will render the Sixth Amendment problem moot. I believe the court should not prematurely and unnecessarily address this very difficult issue.

The majority writes that the state violated Wilkerson's right to confrontation by limiting the cross-examination into Riley's prison transfer. I question, but do not decide, whether the state indeed violated Wilkerson's Sixth Amendment right. I bring up the following critique only to show that we should not try to resolve this thorny (and potentially moot) issue at this point.

-18-

First, it is not at all clear from the record if Riley's letters to the prison administration shed much light on his alleged bias.[38] Wilkerson argues that Riley had an incentive to fabricate testimony to curry favor with prison officials and receive a transfer from a maximum to a medium security prison. A few facts put a different gloss on Riley's transfer request. The Louisiana Supreme Court has emphasized that Riley, "fearing for his life [from Wilkerson], requested to be moved." *Louisiana v. Wilkerson*, 326 So.2d 353, 357 (La. 1976). As the district attorney told the state trial judge in a colloquy, the state of Louisiana, as a safety measure, usually transfers an inmate who will testify against a fellow inmate. Furthermore, it is not obvious from the record if Riley requested to be transferred only to medium security prisons. He might have requested a transfer to a different, but similarly inhospitable, maximum security prison)) just so that he could stay away from Wilkerson.[39]

---

[38]    Riley's letters are not in the record, so we must rely on the characterizations of them described in the trial transcript and the judicial opinions.

[39]    Wilkerson's attorney noted in a sidebar conversation that Riley, in his letters, "asked in one place to be transferred to DeQuincy and in another place that he be transferred to Camp H just a medium security area." It is unclear from the record if DeQuincy is a maximum or medium security prison, but the attorney's contrast between DeQuincy and Camp H suggests that DeQuincy is a maximum security penitentiary. If that is the case, it undermines Wilkerson's argument that Riley had an incentive to lie in hopes of being transferred to a medium security prison.

Second, the trial court's interest in preventing mistrial possibly outweighed Wilkerson's competing interest in cross-examining Riley about the letter. *See Davis*, 415 U.S. at 1111 (recognizing that an important state interest can sometimes trump the right to an unfettered cross-examination). The state trial judge limited the cross-examination into Riley's transfer because he worried that this line of questioning would broach Wilkerson's first trial, where Riley had also testified. He warned Wilkerson's attorney during a colloquy about the transfer: "[Y]ou are bordering [] very close to a mistrial by asking him about the previous trial. The man [Riley] was careful enough in his testimony not to disclose anything about it but I want to caution you." Apparently, the state trial judge feared that Wilkerson's attorney would elicit testimony about the previous trial, and lay the seeds of a mistrial should Wilkerson be found guilty. The judge's fear of a manufactured mistrial may not have been misplaced: after his conviction, Wilkerson moved for a mistrial because a prospective juror during voir dire had mentioned that he knew this case was "back for retrial."[40] *See Louisiana v. Wilkerson*, 326 So.2d at 355

---

[40] The majority argues that this fear of a mistrial was unwarranted because a prospective juror had already informed the jury of the prior trial. But the Louisiana Supreme Court dismissed the significance of the prospective juror's statement, saying "it is extremely unlikely that the comment drew the attention" of the jurors. *Louisiana v. Wilkerson*, 326 So.2d at 355.

(rejecting the motion for mistrial).

Third, despite limiting testimony regarding the prison transfer, the state court nevertheless might have allowed constitutionally sufficient probing into Riley's potential bias. *See United States v. Mizell*, 88 F.3d 288, 293 (5th Cir. 1996) (holding that limits on cross-examination did not violate the Sixth Amendment because the "jury was given adequate information to appraise the bias and motives of the witness.") The court allowed Wilkerson's attorney, Leslie Ligon, to cross-examine Riley about potential deals with the state. Ligon, for instance, asked Riley whether he received anything in exchange for his testimony. Ligon also cross-examined Riley about receiving preferential treatment:

Q: Were you charged with this murder?

A: No, sir.

Q: How many other people were charged with this murder?

A: Six or seven I guess, I'm not sure.

Q: Is it or is it not true that you were the only person that was out of his cell that was not charged with this murder?

A: I wouldn't know...

Q: But you were not charged?

A: No, sir.

The court also allowed Ligon to attack other aspects of Riley's credibility: he pointed out that Ligon was a convicted armed robber, was dishonorably discharged by the Marines, took medication for psychological problems, and visited a psychiatrist at the penitentiary.

Finally, while res judicata does not attach to the denial of habeas relief, *see Schlup*, 513 U.S. at 317, I note that a Fifth Circuit panel rejected Wilkerson's prior habeas petition, which raised this same Sixth Amendment claim. *See Wilkerson v. Whitley*, 16 F.3d 64 (5th Cir. 1994). The Fifth Circuit *en banc* then affirmed the panel's decision. *See Wilkerson v. Whitley*, 28 F.3d 498 (5th Cir. 1994) (en banc opinion).