**Opinion issued February 14, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NOS. 01-11-00216-CR**
**01-11-00217-CR**
**01-11-00218-CR**
**01-11-00219-CR**

———————————

**LEONARD RAY DAVIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 60383**

---

**MEMORANDUM OPINION**

Leonard Ray Davis appeals his conviction for four counts of indecency with

a child. *See* TEX. PENAL CODE ANN. § 21.11 (West 2011). A jury found Davis

guilty and assessed his punishment at eight years' confinement and a $10,000.00 fine for each count. The trial court ordered the sentences to run consecutively. In this appeal, Davis raises two points of error. In the first, Davis urges us to conclude that the trial court abused its discretion in denying Davis's motion for new trial, which was based on Davis's claim that his trial counsel rendered ineffective assistance. In his second issue, Davis contends the trial court erred by failing to include in the charge a limiting instruction regarding the proper use extraneous offense evidence.

We affirm.

## Background

Davis lived across the street from Robert Phillips. Davis was a frequent visitor at Robert's house; he regularly went over to check on Robert's elderly mother, Lula Phillips, who lived with Robert. Lula had been disabled by a stroke. Although she was able to communicate, she was unable to walk and was mostly confined to a chair. Davis generally checked on Lula during the day, when Robert was away from home.

Two of Robert's children, a son and a daughter, also lived in Robert's home. At the time of the incident, the son was not home, but a third child of Robert's, a daughter, was visiting for the weekend. Robert's two daughters, Rachel (age 14)

and Rena (age 9), are the complainants.  The sisters' six-year-old cousin, Tina,[1] and the elderly Lula were also at Robert's home at the time.

*Guilt-Innocence*

The incident took place one evening in 2009, when Robert was out at a Super Bowl party.  The State's first witness, Rachel, testified that she was on the phone in her father's bedroom in the back of the house when Davis arrived.  Rena had been in the bedroom with Rachel, but Rena went to the front of the house when the girls heard someone come in.  Rachel heard Tina, who was well-acquainted with Davis, laughing and giggling in the front room, and then Davis came into Robert's bedroom, where Rachel was.  Davis grabbed Rachel and touched her breast and genitals over her clothing.  Rachel was able to get free and, at that point, Rachel told Davis to "get out."  Davis left the room and, a short time later, Rachel heard her sister call, "[Rachel], come help me."

When Rachel walked into Lula's bedroom, Tina was by the closet and Davis was holding Rena down on the floor.  Davis got off Rena and grabbed Rachel, throwing her on top of Rena.  Rachel testified that they were wrestling and playing around, but she became uncomfortable because Davis started touching her breast again.  She did not think it was accidental; she knew Davis was doing it on purpose because of the way he grabbed her breast.  At that point, Rachel said she was

---

[1]    "Tina," "Rachel," and "Rena" are pseudonyms.

calling her father, and Davis got up and left. After Davis left, Rena went to the bathroom and started crying. Rachel asked what was wrong, and Rena told her that before Rachel came into the room, Davis had unzipped his pants and tried to put his "thingy" in her mouth. Rachel could not explain why she did not scream for help at any point during the incident.

Rena also testified at trial. She explained that she lived with her mother and was only visiting her father's house on the day of the incident. She had met Davis for the first time earlier that day, when they had been outside playing basketball. When Davis came into the house that evening, Rena was in her father's bedroom with Rachel, and Tina and Lula were in the living room. Rena believed the person entering the house would be her brother, but when she stepped into the hallway she saw it was Davis. Rena testified that she said "hey" to Davis, and Davis grabbed her and began touching her breast and genitals over her clothes.[2] She told Davis, who smelled like alcohol, to "stop it," but Davis did not stop, so Rena kept hitting him until Rachel came into Lula's room to help. When Rachel arrived, Davis let go of Rena, grabbed Rachel, and pushed Rachel on top of Rena. Rena testified that they all fell to the floor, and Davis, who had unzipped his pants, used one hand to hold Rachel's leg and the other to put Rena's head down "on his private part."

---

[2] Rena did not testify that Davis went into the bedroom where Rachel was on the phone. She said she did not see Davis go talk to Rachel, but that he could have gone back to talk to her.

4

Rena testified that she believed Davis's "private part" made contact with her lip. Rena explained that the room was fairly dark at the time, lit only by a television that was on, and that, although Tina was in the room and also joined the fracas and began hitting Davis, Tina was giggling and laughing and seemed to think it was a game: "[S]he thinks it's fun."

After Davis left, Rachel called her father and told him what had happened. Robert testified that, when he returned home, his daughters were in hysterics. He asked them to explain what had happened again and, after they did, Robert decided to confront Davis. He crossed the street to Davis's house, but Davis would not come out for approximately half an hour. Robert testified that when Davis did come out—around the time police arrived—Davis was drunk.

The State also presented the testimony of the responding officer. He testified that, upon his arrival at the scene, both girls seemed upset and reported that Davis had touched their breasts. Rena also reported that Davis tried to put his penis in her mouth. The officer explained that when he spoke to Davis, Davis admitted going over to the house earlier in the evening, but denied touching the girls inappropriately.

The investigating officer also testified at trial. He testified that he interviewed Rena in his office, and she recounted the events of that day: they were playing basketball during the day and later were inside the house when Davis

5

arrived and "started messing with her breast and her private part." She identified the areas Davis touched—her breast and genitals—on a diagram and also identified Davis in a photo spread. The investigating officer also interviewed Rachel, who gave a similar account: they had played basketball earlier, and later, when she was in her father's bedroom, Davis arrived. She initially thought Davis was play wrestling with her sister, but then realized Davis was rubbing Rena's breast and genitals.

The girls' mother also testified briefly. She commented that she spoke with both girls about the incident and that their accounts of the incident remained fairly consistent between the time of the incident and the time of trial. She also explained that, since the time of the incident, Lula's condition had worsened such that, by the time of trial, Lula had severe Alzheimer's and was unable to perform basic self-care functions such as eating and bathing.

Davis presented two witnesses in the guilt-innocence phase of the trial: Ernestine Cooper and Roger Cantu. Cooper testified that she is Lula's daughter, the aunt of Rachel and Rena, and the grandmother of Tina. Cooper testified that she has known Davis her whole life and trusts him. She explained that Davis has helped take care of Tina since the time she was three years old, without incident. On cross-examination, Cooper admitted that she has never asked Tina about the incident and had not heard about it from Rachel and Rena either. Rather, what

6

Cooper heard "is off the streets." When the State chastised her for not speaking to the children about the incident, Cooper said: "I can't say he did it. I can't say he didn't do it. All I can say what he hadn't did to my granddaughter. He has taken care of my mom."

Roger Cantu, who is Davis's nephew, also testified on Davis's behalf. Cantu described his exchange with Rachel on the day after the incident. Cantu asked: "Why you lie on my uncle like that? You know that ain't nothing to play with." He testified that, in response, Rachel admitted that she had lied when she accused Davis of touching her. Specifically, Cantu said Rachel "started yelling and stuff, saying 'Yeah, I lied. Yeah, I lied. What you going . . . to do about it?" On cross-examination, Cantu testified that on the day of the incident he was playing basketball in the street, about twenty or thirty yards from Cooper's house. Six or seven members of his family, including Davis, were drinking and barbecuing. Davis played some basketball and then went over to tell Tina to go in the house because she was outside and nobody was watching her. According to Cantu, Davis told her to go into the house and went over himself to say "hi" to Lula. Cantu explained that, while he could not say what happened in the house, Davis "just peeked his head in the door" and could not have been there more than five minutes. He believed Rachel and Rena's accounts were fabricated and that the incident could not have happened with others in the house because "they're not

going to sit there and watch it" and, in any event, nobody came out of the house to say what was happening. Cantu acknowledged that Davis "probably had a couple of beers, but he wasn't drunk." Cantu also acknowledged that he, Cantu, was on probation for a felony, aggravated assault.

The jury found Davis guilty of all four counts of indecency with a child, one each for touching Rachel's breast, Rachel's genitals, Rena's breast, and Rena's genitals.

*Punishment Stage*

During the punishment stage, the State introduced a pen packet reflecting Davis's six previous convictions, including two drug-related felony convictions and an assault causing bodily injury of a family member. Davis stipulated that he was the person previously convicted in those cases. Davis then called his sister, Kay Sterling. Sterling testified that Davis has a large family, including several grandchildren and great-grandchildren, and that his family would miss him if he were in prison, particularly because he is the one in the family who provides guidance to the kids. Sterling testified that she believed anyone who inappropriately touched children should be punished, but she did not think Davis was guilty and asked for leniency. She also said that, although Davis had problems in the past, he had never been accused of any inappropriate behavior with children.

8

The jury assessed eight years' confinement and a $10,000.00 fine for each count. On the State's motion, the trial court ordered that the sentences run consecutively.

*Motion for New Trial Hearing*

Davis filed a motion for new trial asserting ineffective assistance of counsel. In his written motion to the trial court, as in his brief on appeal, Davis complained about many alleged deficiencies in his trial counsel's representation. But the evidence at the hearing on the motion for new trial did not touch on most of Davis's complaints. The main focus of the hearing was trial counsel's general defense strategy and his alleged failure to investigate the case in a manner that would allow him to develop that strategy with evidence at trial.

Trial counsel testified that his strategy was to show that Rachel and Rena's accounts were not credible because the incident could not have occurred without the others who were present in the home having heard something. He explained that Tina and Lula were both there, but neither of them seemed to have heard anything. In particular, trial counsel noted that the police report indicated that Tina said she "really didn't notice anything." Despite articulating this strategy, trial counsel admitted that he did not interview Tina or Lula. Nor did he subpoena them to trial. When asked to explain these decisions, he said he decided not to investigate as to Lula based on Davis's statement that Lula "had a stroke and really wasn't able to talk." Regarding Tina, he said that while it would have been nice to

9

have her testify that she did not notice anything going on, "it would have been hard to get a six-year-old to testify."[3]  Accordingly, trial counsel decided that he could advance his defense theory by pointing out inconsistencies in the State's witnesses' testimony on cross-examination.

A few other issues were addressed briefly at the hearing.  Trial counsel explained his rationale for calling Cooper and Cantu in the guilt-innocence phase and his general strategy regarding jury selection. He explained that, because of the size of Davis's pen packet, neither he nor Davis wanted Davis to testify during guilt-innocence.  He also noted that, while he did want Davis to testify during the punishment phase, Davis decided he would not.  He explained that he succeeded in keeping the most damaging evidence in the case—videos of Rachel's and Rena's interviews—out of evidence.  He had reviewed the video interviews and police reports in preparation for the trial and believed that ultimately, the complainants' testimony—and particularly that of Rena, whom he described as more articulate— made the difference in the trial.   He also explained that he interviewed Davis's sister, Sterling, who testified during the punishment phase of the trial and at the new trial hearing, at least one or two trial settings before the trial.  He added that he and Sterling talked about the defense strategy.  With respect to the punishment phase, counsel explained that his strategy was to persuade the jury to assess a

---

[3]     Although the record is not perfectly clear, it appears that Tina was six years old at the time of the incident and eight by the time of trial.

punishment on the low end of the range because Davis was already in his late fifties, and a long sentence would ensure that he would die in jail.

Davis's sister Sterling was the only other witness at the new trial hearing. Sterling testified that early in the representation, trial counsel asked her to think about who could serve as a witness on Davis's behalf. She also acknowledged that trial counsel met with both witnesses Sterling mentioned to him, and that he did so before the trial, but that she also had problems getting trial counsel to respond to her attempts to communicate with him. Davis offered no affidavits or other testimony in support of his motion for new trial.

The trial court denied Davis's motion for new trial, finding that neither ineffectiveness nor prejudice was shown by the preponderance of the evidence. It continued: "In fact, the performance was effective, did not prejudice the defense, or the presentation of evidence on behalf of the defense." The trial court noted that trial counsel called three witnesses—Cooper, Cantu, and Sterling—and that "there's been no showing that rises to the level of a preponderance of the evidence to show that there was a deficient or prejudicial representation; and I will find that counsel was effective."

## Ineffective Assistance of Counsel

### A.     Standard of Review

We review Davis's challenge to the denial of his motion for new trial based on ineffective assistance under an abuse of discretion standard, reversing "only if the trial judge's opinion was clearly erroneous and arbitrary." *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). We view the evidence in the light most favorable to the trial court's ruling, must not substitute our judgment for that of the trial court, and must uphold the ruling if it was within the zone of reasonable disagreement. *Id*.; *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Riley*, 378 S.W.3d at 457. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support its ruling. *Id*.; *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We review the totality of the representation and the circumstances of each case without the benefit of hindsight. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

### B.     Law Applicable to Ineffective Assistance Claims

To prevail on a claim of ineffective assistance of counsel, an appellant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's unprofessional error, there is a reasonable

12

probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 2055–56 (1984); *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). A defendant has the burden to establish both prongs by a preponderance of the evidence; failure to make a showing under either prong defeats a claim for ineffective assistance. *Lopez v. State*, 343 S.W. 3d at 142; *see Mitchell*, 68 S.W.3d at 642.

With respect to the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." *Robertson v. State*, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006) (quoting *Strickland*, 466 U.S. at 669, 104 S. Ct. at 2055). "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record." *Lopez*, 343 S.W.3d at 142 (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143 (citing *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Under the second prong of *Strickland*, an appellant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

"The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).

## C.     Law Applicable to Indecency with a Child

A person commits the offense of indecency with a child by contact if the person engages in sexual contact with a child younger than seventeen years and not the person's spouse. TEX. PENAL CODE ANN. § 21.11(a)(1), (c) (West 2011). "Sexual contact" includes the following acts (among others), if committed with the intent to arouse or gratify the sexual desire of any person: any touching by a person, including touching through clothing, of the breast or any part of the genitals of a child. *Id.* § 21.11(c)(1). Davis was charged with four offenses: touching Rachel's breast, Rachel's genitals, Rena's breast, and Rena's genitals.

## D.     Analysis

Davis contends his trial counsel rendered ineffective assistance in several ways. Chief among them is counsel's alleged failure to investigate further, by interviewing the two potential trial witnesses—Tina and Lula—who were in the home at the time of the incident. Davis complains about the following other aspects of trial counsel's representation:

- failure to file a motion to require the State to identify an outcry witness;

- inadequate performance in voir dire, examination of witnesses (of both sides), and closing argument (of both sides);

14

- failure to object to certain evidence and inadequate presentation of evidence during trial;

- failure to request a limiting instruction regarding extraneous offense evidence; and

- failure to object to the presentation of a victim impact statement before pronouncement of sentence.[4]

We address each of these in turn.

### 1. Failure to interview and present potentially exculpatory witnesses

"[C]ounsel has an absolute duty 'to conduct a prompt investigation of the circumstances of the case and to explore all avenues likely to lead to facts relevant to the merits of the case.'" *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) (quoting ABA STANDARDS FOR CRIMINAL JUSTICE: THE DEFENSE FUNCTION, Standard 4–4.1 (2d ed. 1986)). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (quoting *Wiggins v. Smith*, 539 U.S. 510, 522–23, 123 S. Ct. 2527, 2535 (2003)). The United States Supreme Court has summarized:

---

[4] In his motion for new trial, Davis raised other alleged deficiencies in the representation. For example, the written motion for new trial asserts that trial counsel failed to advise Davis of the possible range of punishment, failed to advise Davis of the possible results of trial, and failed to offer evidence of Davis's eligibility for probation. None of these points are raised in Davis's appellate brief.

15

Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Wiggins*, 539 U.S. at 521–22, 123 S. Ct. at 2535 (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066), *quoted in Ex parte Briggs*, 187 S.W.3d at 466–67.

The second prong of *Strickland* requires a showing that counsel's deficient performance—here, the alleged failure to investigate or interview witnesses—"preclude[d] the accused from advancing a viable defense." *Perez v. State*, No. 14-07-00414-CR, 2008 WL 5220302, *4 (Tex. App.—Houston [14th Dist.] Dec. 11, 2008), *aff'd*, 310 S.W.3d 890 (Tex. Crim. App. 2010). This requires a showing that the potentially exculpatory witnesess "were available and [the defendant] would benefit from their testimony." *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)); *see Lair v. State*, 265 S.W.3d 580, 594–95 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (counsel ineffective when he failed to investigate and call witnesses where record included affidavits of *twenty witnesses who were available and willing to testify on defendant's behalf*).

In other words, to satisfy the prejudice prong, the record must reflect that the witnesses who were not called were available and that the evidence they could

16

have provided would have been helpful enough that it is reasonably probable that it would have changed the outcome of the proceeding. For example, in *Butler v. State*, counsel's deficient representation prejudiced the defendant where counsel failed to interview an alibi witness and two eyewitnesses who could testify to misidentification of the defendant *and* the exculpatory witnesses provided the evidence at the motion for new trial hearing that would have been helpful to the defense, had it been offered at trial. 716 S.W.2d 48, 56 (Tex. Crim. App. 1986). One testified that the defendant was with her at her apartment at the time of the robbery and the other two said they saw the man who committed the robbery and it was not the defendant. *Id.*

Likewise, in *In re I.R.*, the El Paso Court of Appeals concluded the defendant was prejudiced by counsel's failure to interview a witness after being told of his existence. *In re I.R.*, 124 S.W.3d 294, 300 (Tex. App.—El Paso 2003, no pet.). But in that case, as in *Butler*, the alibi witness testified at the motion for new trial and explained that the defendant was in New Mexico with him on the day of the assault and, therefore, could not have committed the assault, which took place in Texas. *Id.*

This case contains no analogous evidence. There is no evidence (live or affidavit) from an alibi witness or from Lula and Tina, whom Davis claims trial counsel was deficient for failing to interview and present at trial. Nor is there

17

evidence that either of them was available to testify at trial. In fact, the record reflects that Lula suffered from severe Alzheimer's by the time of trial and that she died shortly before the hearing on the motion for new trial. It also reflects that Davis informed trial counsel, before the trial, that Lula was, for the most part, unable to speak.

Davis argues that trial counsel's admission that the police report indicated Tina did not hear or notice anything supports a finding of prejudice.[5] But Tina's statement to the officer, without more, does not create a reasonable probability that the outcome of the proceeding would have been different had Tina testified that she did not hear or notice anything. Without additional evidence—for example, evidence about how closely Tina observed what happened, given the low lighting in Lula's room, or about whether Tina saw the physical contact but believed it to be play wrestling, or about whether Tina, who was eight years old at the time of trial, could remember and articulate what she observed two years earlier—we cannot determine what, if any, significance to attach to the bare fact that Tina reported to the officer that she did not hear or notice anything during Davis's visit. This is particularly true given the testimony that Tina believed they were all playing a game. Accordingly, even assuming trial counsel did not exercise reasonable professional judgment in deciding not to investigate Lula and Tina's

_____

[5] The record does not contain the police report itself.

18

potential testimony, Davis failed to meet his burden, under *Strickland's* second prong, to demonstrate that there is a reasonable probability that the result of the proceeding would have been different if Lula or Tina had testified. *See Melancon v. State*, 66 S.W.3d 375, 381 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (holding appellant failed to show prejudice in ineffective assistance claim where record contained no evidence of what testimony the alleged exculpatory witnesses could provide); *see also Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) ("[A] claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably could have changed the result of the case."); *cf. Butler*, 716 S.W.2d at 56 (holding defendant carried burden of proving prejudice where witnesses testified at motion for new trial hearing, setting forth exculpatory evidence they could have offered had counsel properly investigated defendant's case); *In re I.R.*, 124 S.W.3d at 300 (same).

### 2. Failure to file pretrial motion requesting notice of intent to present outcry witness

Davis next argues trial counsel was ineffective because he "failed to file a motion or request for the State to timely file a 'Notice of Intent to Present Outcry Statement' pursuant to [Texas Code of Criminal Procedure article] 38.072." When, as here, a defendant is charged with certain sexual offenses against a complainant under the age of fourteen, article 38.072 of the Texas Code of

19

Criminal Procedure allows the admission of the complainant's hearsay statement "so long as that statement is a description of the offense and is offered into evidence by the first adult the complainant told of the offense." *Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011) (discussing TEX. CODE CRIM. PROC. ANN. art. 38.072 (West. Sup. 2012)); *see Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). The adult who testifies is commonly referred to as an "outcry witness." *Sanchez*, 354 S.W.3d at 484. To invoke the statutory exception, the party intending to offer the statement must meet certain procedural requirements, including timely notifying the defendant of the outcry witness's name and a summary of the testimony. TEX. CODE CRIM. PROC. ANN. art. 38.072; *see Lopez*, 343 S.W.3d at 140.

In *Lopez*, the court of appeals found ineffective assistance based on counsel's failure to require the State to follow the proper procedures under section 38.072. *Lopez*, 343 S.W.3d at 140. The Court of Criminal Appeals reversed because the record was silent about trial counsel's reasons for allowing the hearsay into evidence and, therefore, appellant had not overcome the "strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Id.* at 142; *see Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

Here, just as in *Lopez*, the record reveals nothing about trial counsel's reasons for failing to require the State to file a notice under article 38.072 or for

allowing the hearsay statements into evidence without objection. At the hearing on his motion for new trial, Davis did not ask trial counsel to explain his strategy in this regard. Accordingly, with respect to this complaint, we hold Davis has not met his burden of overcoming the presumption that counsel's performance was reasonable. *See Lopez*, 343 S.W.3d at 142.

### 3. Failure to conduct more thorough voir dire

Davis also contends trial counsel failed to conduct a meaningful voir dire in many respects. Davis complains that counsel (1) spent only twenty minutes conducting voir dire, (2) inadequately explained reasonable doubt and the reasons a defendant might exercise his constitutional right not to testify, and (3) failed to ask follow-up questions of venire members 12 and 27, whom he claims indicated possible bias.

While trial counsel was asked about and explained his general strategy for jury selection at the motion for new trial hearing—it was to identify and strike those whom he believed would not fully consider the evidence, especially older women—he was not given the opportunity to address the specific complaints about voir dire that Davis raises here. Trial counsel should ordinarily be given an opportunity to explain his actions before being denounced as ineffective. *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Accordingly, where, as here, the record is silent regarding trial counsel's trial strategy about the complaints

21

raised on appeal, the defendant has not overcome the presumption of reasonable assistance. *Id.* at 834; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *see also McFarland v. State*, 928 S.W.2d 482, 504 (Tex. Crim. App. 1996) (refusing to second guess trial counsel's decision not to ask follow up questions of venire member) *abrogated on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998).

### 4. Failure to develop defensive theory through cross-examination

Davis contends trial counsel was ineffective for failing to develop his defense strategy through cross-examination of the State's witnesses. Trial counsel may make strategic decisions as to whether and how to cross-examine witnesses. *See Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973) ("Often, the decision to not cross-examine a witness is the result of wisdom acquired by experience in the combat of trial."), *cited in Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005); *Navarro v. State*, 154 S.W .3d 795, 799 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (acknowledging circumstance in which it would be "entirely reasonable or foreseeable that a defense attorney would limit his cross-examination out of fear of alienating a jury or coming across as too aggressive"); *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) ("Cross-examination is inherently risky, particularly in criminal cases where pre-trial discovery is more limited than in civil cases.").

22

Here, Davis concedes that trial counsel cross-examined Rachel about the layout of the house, consistent with his strategy of showing that the house was small enough that others in it at the time of the incident should have heard that something was amiss. But Davis complains that trial counsel did not adequately establish the relevant size and location of the rooms, and did not enter a diagram of the layout of the house into evidence. Davis also complains that trial counsel either did not cross-examine, or cross-examined too briefly, the State's other witnesses.

At the hearing on the motion for new trial, trial counsel was not asked why he cross-examined witnesses as he did. Trial counsel should ordinarily be given an opportunity to explain his actions before being denounced as ineffective. *Bone*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Where the record is silent regarding trial counsel's trial strategy as to the complaints raised on appeal, the defendant has not overcome the presumption of reasonable assistance. *Id*. at 834. We conclude Davis has not met his burden to prove counsel's performance in cross-examining witnesses was deficient.

### 5. Choice of defense witnesses

Davis next complains that trial counsel was ineffective in calling Cooper and Cantu as defense witnesses. He argues Cooper was an unwise choice because she was not in the home at the time of the incident and could provide no evidence to

23

advance the defense theory.  And Davis argues Cantu's testimony actually was harmful to the defense.

The decision to call witnesses is generally a matter of trial strategy.  *Joseph v. State*, 367 S.W.3d 741, 744 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *see Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005) (quoting *Wilkerson v. Cain*, 233 F.3d 886, 892–93 (5th Cir. 2000)) (stating "'the presentation of testimonial evidence is a matter of trial strategy'"), *cited in Riggins v. State*, No. 01-08-00693-CR, 2010 WL 2991222, at *6 (Tex. App.—Houston [1st Dist.] July 29, 2010, no pet.) (mem. op., not designated for publication).  The fact that counsel's decision, viewed in hindsight, may not have been the best trial decision is of no consequence.  *See Ex parte Aviles*, WR-71,017-01, 2011 WL 2149933, at *4 (Tex. Crim. App. May 25, 2011) (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2064) ("A finding of ineffectiveness cannot be supported by second-guessing, hindsight, or 'Monday morning quarterbacking' of counsel's trial strategy or the fact that other attorneys might have pursued a different strategy.").

While Cantu was on felony probation at the time of trial, we note that trial counsel did elicit helpful testimony from him.  In particular, Cantu testified that Rachel admitted to falsely accusing Davis.  And, while Cooper may not have been present at the time of the incident, her testimony about trusting Davis with Tina was helpful to Davis.  Even if we were to accept Davis's contention that trial

24

counsel's selection of witnesses ultimately did not help—even harmed—Davis's case, we cannot conclude that trial counsel's representation was deficient in this regard. *See Ex parte Jiminez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) (noting test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight); *Almanzar v. State*, No. 01-11-01058-CR, 2012 WL 6645003, at *11 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, no. pet. h.) (mem. op., not designated for publication) (holding counsel was not deficient despite claim that calling certain witness "backfired" where witness did provide favorable testimony).

### 6. Failure to object to State's evidence

Davis contends that trial counsel's performance was deficient because he failed to object to certain evidence, including (1) Davis's pen packet[6] and the officers' testimony about what Rachel and Rena told them, all of which Davis contends contained hearsay, and (2) testimony that Davis's penis touched Rena's lip, which Davis contends was an inadmissible extraneous offense.

We note, first, that it is possible that trial counsel opted not to object to unfavorable evidence in order to avoid drawing emphasis to it. *See Warren v. State*, 377 S.W.3d 9, 20 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (stating appellate court, in absence of evidence of evidence of counsel's reasons, will

---

[6] Davis's pen packet was admitted in the punishment phase of the trial.

25

assume strategic motivation for counsel's failure to object); *Cooper v. State*, 788 S.W.2d 612, 618 (Tex. App.—Houston [1st Dist.] 1990, pet. denied) (overruling ineffective-assistance issue when objection to allegedly inadmissible testimony would have likely focused jury's attention on a fact that was unfavorable to the defendant). We also note that extraneous offenses are not always inadmissible, and that counsel is not deficient for failing to make a futile objection. *See Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (holding it is valid strategy not to object if objection would have been futile); *Lockhart v. State*, 847 S.W.2d 568, 570 (Tex. Crim. App. 1992) (extraneous offenses may be admissible to show motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). In any event, the record is silent as to trial counsel's strategy or reasons for not objecting to this evidence, and Davis thus has not rebutted the presumption that counsel's performance was reasonable. *See State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008); *Bone*, 77 S.W.3d at 834.

### 7. Failure to object to improper closing argument

Davis complains trial counsel failed to object to three allegedly improper comments in the State's closing arguments: (1) the State's argument that the jury, in reaching its verdict, should consider the need to protect Tina given that her grandmother was sticking her head in the sand by never discussing the incident; (2) the State's reference to Davis's attempt to place his penis in Rena's mouth; and

26

(3) the State's suggestion that Sterling's testimony indicated Davis did not take responsibility for his actions, which Davis contends was an improper comment on Davis's failure to testify.

The record is silent about trial counsel's reasons for not objecting. Even assuming the comments were improper, it is possible that trial counsel decided against objecting to avoid drawing further emphasis to them. *See Dickerson v. State*, 87 S.W.3d 632, 638–39 (Tex. App.—San Antonio 2002, no pet.) (silent record would not support finding of ineffective assistance regarding prosecutor's patently improper closing remarks where defendant had opportunity to develop ineffective assistance claims in motion for new trial but failed to do so); *Castoreno v. State*, 932 S.W.2d 597, 603 (Tex. App.—San Antonio 1996, pet. ref'd) (noting possibility that counsel decided to not object because objection would have emphasized evidence). We may not speculate in this regard; because the record is silent, we conclude that trial counsel failed to rebut the presumption that counsel's conduct was reasonable. *See Morales*, 253 S.W.3d at 696–97; *Bone*, 77 S.W.3d at 834.

## 8. Failure to deliver a more thorough closing argument

Davis contends that counsel rendered ineffective assistance during closing argument insofar as his argument was too short and did not adequately summarize the evidence favorable to Davis. Davis asserts that counsel, instead of pointing out

27

that Davis had never done anything like this before, should have argued that the Rachel's and Rena's testimony was not consistent, that Cantu provided a motive for Rachel to lie, that a drunk man would be unable to work the zipper to his trousers while fighting with two girls, that the complainants had no defensive wounds, and that the house showed no damage or signs of a struggle.

"[D]eference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S. Ct. 1, 4, (2003). Here, the record is silent concerning counsel's strategy during argument or reasons for arguing the case as he did. Davis has therefore not rebutted the presumption that counsel's actions were reasonable. *See Mathison v. State*, No. 08-10-00098-CR, 2012 WL 248002, at *5 (Tex. App.—El Paso Jan. 25, 2012, no pet.) (not designated for publication) (citing *Yarborough*, 540 U.S. at 6, 124 S. Ct. at 4, and holding silent record did not overcome presumption of reasonableness even when counsel decided to make no argument); *see also Mendoza v. State*, No. 09-11-00303-CR, 2012 WL 2849261, at *4 (Tex. App.—Beaumont July 11, 2012, pet. ref'd) (mem. op., not designated for publication) (holding silent record did not overcome presumption of reasonableness where counsel's purported error involved admitting defendant's guilt during argument).

### 9. Failure to request limiting instruction

Davis complains that counsel failed to request a jury charge instruction during the punishment phase of his trial that informed the jury that it could consider evidence of extraneous offenses only if it found beyond a reasonable doubt that Davis committed them. This issue was not addressed at the motion for new trial hearing and, therefore, the record is silent about the reason for trial counsel's inaction. Accordingly, we may not speculate to find counsel's performance ineffective. *See Ex parte Varelas*, 45 S.W.3d 627, 632 (Tex. Crim. App. 2001) (reviewing court may not speculate as to why trial counsel failed to request limiting instruction when record is silent, even if court has difficulty understanding counsel's inaction). Even if we assumed the failure to request a limiting instruction fell below an objective standard of reasonableness, Davis still could not prevail on his ineffective assistance claim because, under the second prong of *Strickland*, he has not shown that there is a reasonable probability that the outcome of his trial would have been different if trial counsel had succeeded in obtaining a limiting instruction. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

### 10. Failure to object to victim impact statement

Finally, Davis argues his trial counsel was ineffective for failing to object to the presentation of a victim impact statement, which was presented after the trial

court received the jury's verdict but before it pronounced sentence. Davis contends trial counsel should have objected because the presentation of the victim impact statement ran afoul of article 42.03 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 42.03, § 1(b) (West 2006 & Supp. 2012).

Article 42.03 requires, if a victim impact statement is made by a person who "appear[s] in court," that the statement be presented after sentence is pronounced. *Id.* In contrast, article 56.03 governs written impact statements, and it states that the trial court shall consider the information provided in the statement "prior to the imposition of a sentence." TEX. CODE CRIM. PROC. ANN. art. 56.03 (West Supp. 2012).

The record does not make clear whether the victim impact statement at issue was written or oral. We note, however, that in their briefs both Davis and the State refer to the statement as a written one that was read into the record. Additionally, this issue was not discussed at the motion for new trial hearing, so the record is silent concerning counsel's reasons for not objecting. We conclude Davis has not met his burden of showing counsel was ineffective. *See Tong v. State*, 25 S.W.3d 707, 713–14 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 1053, 121 S. Ct. 2196 (2001) (holding counsel's failure to object to "arguably objectionable" victim impact testimony and evidence was not ineffective assistance of counsel when trial record was silent as to counsel's strategy); *see also Jagaroo v. State*, 180 S.W.3d

793, 799 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (citing *Tong* and stating appellant had not overcome presumption that counsel acted reasonably when record was silent concerning failure to object to victim impact statements).

We have considered the totality of the representation and all of the circumstances of the case without the benefit of hindsight. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel.). We have also considered each of Davis's complaints regarding trial counsel's performance. Whether we consider the complaints individually or in combination, we hold that Davis did not meet his burden under *Strickland* to show that trial counsel's performance was deficient and that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687; *Lopez*, 343 S.W.3d at 142; *see also Brennan v. State*, 334 S.W.3d 64, 79 (Tex. App.—Dallas 2009, no pet.) (where individual acts or omissions of counsel were not established to be ineffective assistance, complaint that totality of representation was ineffective must fail).

We overrule Davis's first issue.

**Failure to Include Limiting Instruction regarding Extraneous Offense**

In his second issue, Davis contends the trial court erred by not sua sponte instructing the jury, during the punishment phase, that it could consider the extraneous offense evidence (that Davis attempted to place his penis in Rena's mouth) only if it found the offense had been proved beyond a reasonable doubt. Davis did not request such an instruction, but a trial court has a duty to provide a limiting instruction regarding the proper use of extraneous offense evidence admitted during the punishment stage of a trial even absent objection. *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000) (trial court erroneously failed to instruct jury even where defendant did not object to instruction's omission); *Martinez v. State*, 313 S.W.3d 358, 365 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Huizar*).

We review this charge error for egregious harm under *Almanza*. *Huizar*, 12 S.W.3d at 484–85; *Martinez*, 313 S.W.3d at 365; *Graves v. State*, 176 S.W.3d 422, 435 (Tex. App.—Houston [1st Dist.] 2004, pet. struck) (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). A charge error is egregious when "the defendant is denied a fair and impartial trial." *Graves*, 176 S.W.3d at 435 (citing *Almanza*, 686 S.W.2d at 171). "Errors which result in egregious harm are those which affect 'the very basis of the case,' deprive the defendant of a 'valuable right,' or 'vitally affect a defensive theory.'" *Id.* (quoting *Hutch v. State*, 922

S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 172)). "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171.

Having reviewed the record as a whole,[7] we conclude the failure to include the instruction did not cause egregious harm. The State did not mention the extraneous offense during voir dire or opening statements. It put on strong evidence of guilt. Both Rachel and Rena said that Davis tried to put his penis in Rena's mouth, but the State did not place significant emphasis on it. The State referenced it in closing, but the reference was brief and not the focus of the State's closing. Rather, the State emphasized Davis's prior convictions. The jury assessed identical sentences for Davis's indecency with Rena and with Rachel despite the fact that the extraneous offense related only to Rena. In other words, it did not punish Davis's inappropriate touching of Rena more harshly on account of the extraneous offense. Finally, the sentence fell within the lower half of the available range of punishment. Given the nature of the evidence of Davis's guilt, including the strength of the evidence that he did attempt to place his penis in Rachel's mouth, the undisputed evidence of his prior convictions, the State's emphasis on

---

[7] Davis's brief does not address this issue—it contains no citations to the record or authorities and no analysis or argument concerning egregious harm.

33

the priors in closing, the fact that the jury assessed a punishment on the lower end of the punishment range, and the jury's decision to assess the same punishment for the offenses against Rena as for the offenses against Rachel, we conclude that the record does not support a finding of egregious harm. *See Huizar v. State*, 29 S.W.3d 249, 250 (Tex. App.—San Antonio 2000, pet. ref'd) (on remand from *Huizar v. State*, 12 S.W.3d 479 (Tex. Crim. App. 2000)) (holding no egregious harm even though State "relied on substantial evidence of extraneous conduct in seeking punishment," because ninety-nine year punishment assessed by jury was within authorized range of punishment and record as a whole did not support conclusion that defendant was denied fair and impartial trial); *see also Graves*, 176 S.W.3d at 435 (finding no egregious harm where State introduced extraneous offense evidence and discussed during argument, but jury imposed sentence of eight years on aggravated sexual assault of child case where the range was five to ninety-nine years or life); *Brown v. State*, 45 S.W.3d 228, 232–33 (Tex. App.—Fort Worth 2001, pet. ref'd) (no egregious harm where State asked for high end of two-to-twenty-year punishment range, but jury assessed probation for one charge and a three-year sentence for the other).

We overrule Davis's second issue.

## Conclusion

We affirm the trial court's judgment.

Rebeca Huddle
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish.   TEX. R. APP. P. 47.2(b).